Dear Delegate Bobo:
You have requested our opinion on several questions about the procedures of the Medical Advisory Board ("MAB") of the Motor Vehicle Administration. Your first question concerns the statutory requirement that "good cause" exist for the Administrator to refer a driver for MAB evaluation. Specifically, you ask whether "good cause" may be based, as you describe it, "on a police officer's hearsay information and, after interviewing the driver, [the officer's] conclusion that the driver has the physical defects of `memory and awareness' and `depth perception and reflexes.'" Your second, closely related question, is whether this information is sufficient to trigger an MAB inquiry that instructs the driver, on pain of possible license revocation or suspension, to answer a detailed questionnaire, obtain a physician's report, and broadly authorize release of medical information to the MAB. Finally, you ask whether the questionnaire's delving into various personal matters is, as you put it, "an overly broad invasion of privacy."
Our opinion is as follows:
1. Information reported to a police officer, together with first-hand observations made by the officer about lapses in "memory and awareness" and "depth perception and reflexes," provide sufficiently good cause for the Administrator to request an advisory opinion from the MAB about an individual's fitness to drive.
2. This information is also sufficient to trigger an MAB inquiry that looks at the individual's medical situation. As part of its inquiry, the MAB has authority to request a wide range of information related to the medical conditions that pose a risk to safe driving. A driver who declines to return a completed health questionnaire or a medical report, however, is not subject to a loss of driving privileges for that reason alone.
3. The MAB's health questionnaire is a legally authorized component of the MAB's inquiry, so long as the information elicited bears a reasonable relation to the individual's medical fitness to drive and is used for no other purpose. Because some of the questions posed in the current questionnaire are highly sensitive and bear no obvious direct relationship with medical fitness to drive, the MAB should reconsider whether every item in its current questionnaire satisfies this "reasonable relationship" test.
 I Background
In your letter, you relate the experiences of a constituent which, whether or not typical of MAB referrals, are illustrative of the issues you identify. The driver, an 82-year-old man, was driving southbound along Maryland Route 29, near Route 175, in the fast lane. His wife was a passenger on the seat beside him. Ahead of them, also in the fast lane, was a slower car, which your constituent passed on the left. As he did so, the merge lane he was using ended, and he was driving on the shoulder before he could pull back into the fast lane ahead of the other car. The passed motorist then followed the driver, made a note of his license number, and reported the occurrence to police.
Two Howard County police officers later interviewed the driver and his wife for approximately twenty minutes. Following the interview, one of the officers submitted a "Request for Re-examination of Driver" form to the Motor Vehicle Administration. In the portion of the form that calls for an identification of "physical defects," the officer wrote "memory and awareness" and "depth perception reflexes" and referred to the number of the report submitted by the motorist who had been passed. The officer then summarized the "actions of the driver" as follows:
 On 12-8-96 at approx 1300 hours subject reportedly passed motorists on left shoulder of S/B Route 29 at MD Route 175 (55 MPH) nearly striking other motorists. The subject admitted to driving his vehicle at the time, but was very confused about the event itself.
After listing the name, driver's license number, and telephone number of the witness, the officer certified the information as "true and correct to the best of [the officer's] knowledge, information, and belief." No copy of the form was left with the driver, and we are not told whether the form was completed in his presence. In any event, a copy was provided by the Administration when requested by the driver's counsel.
About a month later, the MAB sent a "Health Inquiry Package" to the driver. Stating that the Administration "has received information which indicates you may have a medical condition that could affect your ability to drive [safely]," the MAB asked the driver whether he was under treatment by a physician, had received treatment for any condition from a clinic or other program within the last 12 months, was attending a self-help group, or was enrolled in a drinking driver monitor program. The MAB also asked the driver to complete and return a four-page "Health Questionnaire" and to sign and return a Consent to Release of Confidential Medical Information. The "Health Questionnaire" seeks "yes" or "no" responses to more than 100 questions relating to the driver's occupational history, substance abuse, criminal background, and medical history.
 II "Good Cause" for Referral
Under § 16-118(c) of the Transportation ("TR") Article, Maryland Code, for the Motor Vehicle Administrator may request an advisory opinion from the MAB "if the Administrator has good cause to believe that the driving of a vehicle by [any licensee or license applicant] would be contrary to public safety and welfare because of an existing or suspected mental or physical disability." In addition, the Administration "may require a licensee to submit to reexamination . . . if . . . the Administration has good cause to believe that the licensee is unfit, unsafe, or otherwise not qualified to be licensed." TR, § 16-207(a)(1)(ii).[1]
The MAB has adopted guidelines that indicate some of the "mental or physical disabilities" that could render a driver unsafe. For example, the MAB has concluded that "[a]n individual who has had a cerebral hemorrhage or infarction that has resulted in a marked change in personality, alertness, or ability to make decisions cannot safely operate any class of motor vehicle. . . ." COMAR 11.17.03.04E(1).
Actual driving behavior may present powerful evidence of a disqualifying condition. While police observation of the behavior would afford an ideal basis for subsequent MAB review, the "good cause" standard in TR, § 16-118(c)(1) is sufficiently flexible to allow for other circumstances as well, including information conveyed by another motorist to the police. This situation is not unlike those in which police are alerted to a drunken driver by citizens who are concerned for their own or others' safety. Courts have generally held such information to be inherently credible and sufficient to justify an investigatory stop of the reported motorist. See United States v. Patterson,691 F. Supp. 908, 912 (D. Md. 1987); Dionne v. State, 766 P.2d 1181, 1183
(Alaska App. 1989); State v. Sailo, 910 S.W.2d 184, 188 (Tex. 1995). Cf. Commonwealth v. Hamilton, 673 A.2d 915, 918-19 (Pa. 1996) (although "erratic driving or traffic violation . . . witnessed by any individual" would be sufficient to establish "reasonable and articulable grounds" for a stop, evidence in the case failed to satisfy this test).
In the incident that prompted your request for an opinion, police received information from an identified individual who had no discernable reason for making up the details of the incident. That information was at least partly corroborated by police through first-hand observations during an interview with the driver that lasted twenty minutes. According to the police, the driver admitted driving his car at the time but gave them the impression that he was "very confused" about the incident itself. Their request for reexamination followed the interview and made specific reference to "memory and awareness" and "depth perception and reflexes."
This procedure parallels that required of officers to develop probable cause for an arrest from information provided by a citizen. Although there have been no cases decided by Maryland appellate courts on this issue, we conclude that they would follow the reasoning of other states, particularly where the result is not an arrest but simply an assessment of fitness to drive. Otherwise, a motorist could endanger other drivers with impunity, even if police are notified and find some observable reason for concern, simply because the police did not happen to witness the endangerment.
 III MAB Inquiry
A. "Good Cause"
For the reasons discussed in Part II above, we conclude that information of the kind described in your letter is sufficient to authorize an MAB inquiry. The other motorist's report and the officer's observation could lead a reasonable person to think that the driver had a medical condition that caused inattentive, risky driving.
B. Scope of Inquiry
The purpose of the MAB is to ensure expert evaluation of compliance "with the provisions of this title regarding the physical and mental condition of individuals who seek to drive on highways in this State." TR, § 16-118(a). Among other provisions, the Vehicle Law prohibits issuance of a driver's license to an individual "[w]hose driving of a motor vehicle . . . the Administration has good cause to believe would be inimical to public safety or welfare" or "[w]ho is unable to exercise reasonable control over a motor vehicle due to disease or physical disability. . . ." TR, § 16-103.1(5) and (6).
In pursuit of this statutory objective, the MAB may seek relevant information about medical fitness to drive. Its review of medical records and related information is properly a part of this inquiry.[2]
C. Effect of Driver's Failure to Respond to Inquiry
The notice that accompanies the MAB's Health Questionnaire requests that all required forms be completed and returned. While the notice states that "failure to comply with this request will result in the suspension (or refusal) of your privilege to drive in Maryland," a hearing is required before the MVA may refuse, suspend, or revoke a license for any reason. TR, § 12-208(a).[3]
A driver's failure to complete and return the questionnaire might well be evidence of the driver's "refus[al] or neglec[t] to submit to a reexamination" under TR, § 16-207, and that refusal or neglect is a basis for suspension or revocation. TR, § 16-207(c). There is no statutory authority, however, for the MAB or the Administrator to suspend or refuse a license automatically after an individual fails to complete and return the Health Questionnaire. The MAB should modify the sentence to convey more accurately the potential consequences of a failure to complete and return the questionnaire.
 IV MAB Questionnaire
The MAB's recommendation that a driver no longer be licensed may have a significant impact on the everyday life of the driver. Therefore, the MAB quite properly seeks to base its advice on detailed and accurate information. To that end, the MAB has developed a comprehensive questionnaire on topics that include personal characteristics; occupational, substance abuse, and criminal history; emotional background; and information about physiological problems.
The request for reexamination in this instance prompted the MAB to send a copy of its questionnaire to the reported driver, with directions to complete and return it in 30 days. According to the instructions that accompany the questionnaire, information is provided to allow confidential review by physicians on the MAB. The questionnaire concludes with a "Prohibition on Disclosure" that recites the protections against disclosure under the Maryland Vehicle Law and federal regulations.[4]
Not all questions apply to all people, and the form is not signed under oath. Thus, the MAB also requires consent for the release of confidential medical information and, where applicable, reports from any treating physician, other providers, and any self-help or drinking driver monitor group. The apparent objective is a composite picture that indicates the presence of any mental or physical disability, its extent, and its potential impact on safe driving.
Some highly personal questions are inevitable if the MAB is to consider possibly disqualifying medical conditions. For example, the MAB's guidelines require that "[a]n individual with severe symptoms of personality, character, or psychotic disorders . . . be evaluated . . . for a license on the basis of alertness, social behavior, psychomotor retardation, and side effects from drug therapy." COMAR 11.17.03.04H(2)(a). Questions aimed at identifying this kind of disorder are, in truth, an invasion of privacy; the question is whether it is a justifiable one. Statutes intended to insure competency of drivers have long been held within the police power of the state. The need for public safety, along with the confidentiality required and the availability of a hearing, lead us to conclude that, in general, the information sought is within the MAB's authority. See StateDepartment of Motor Vehicles v. Miles, 895 P.2d 1316 (Nev. 1995) (the "overriding purpose of public safety" justifies the requirement of supplying health information from a physician).
We should not be understood necessarily to be endorsing every item on the questionnaire. The MAB's quest for a glimpse of the driver's emotional state has led to some extraordinarily personal questions that are not obviously related to driving (for example, "Has your sexual response changed for the worse?" and "Are you having an increasing number of financial problems?"). Perhaps the point of these questions is to identify potential sources of emotional distress sufficient to impair driving; yet, one may doubt whether they usefully do so, given the attenuated link between the questions and actual fitness to drive and the host of other reasons why a driver might be upset. Other questions are so worded that a person wishing to remain licensed might hesitate to answer them at all ("Are you able to `drink your friends under the table'?" and "Have you recently noticed an increase in the frequency of your memory `blackouts'?").
We do not intend to substitute our judgment for that of the MAB about the usefulness of particular information. The MAB is entitled to elicit information about physical, emotional, or substance abuse problems that would contribute to unsafe driving and may request information ordinarily kept private by a driver, provided the MAB has a basis, well-grounded in scientific literature and its own experience, for the belief that the information really is needed for it to assess a driver's medical fitness. We recommend that the MAB promptly review the current questionnaire, and revise it if necessary, to ensure that the required nexus exists.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions and Advice
 Jonathan Acton, II Assistant Attorney General
[1] Age alone may not serve as a basis for examination. TR, § 16-207(a)(2).
[2] The specific components of the MAB's Health Questionnaire are considered in Part IV below.
[3] This requirement reflects constitutional considerations. See, e.g., Mackey v. Montrym, 443 U.S. 1, 10 n. 7 (1979) ("That the Due Process Clause applies to a state's suspension or revocation of a driver's license is clear. . . .").
[4] As a record of the MAB, the questionnaire is confidential and may be disclosed only on court order. TR, § 16-118(d)(1). Its use is to determine fitness to drive and nothing else. TR, § 16-118(d)(2). In the material you have provided to us, we see no suggestion of any improper disclosure of this information.
 *Page 197